**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:69-CV-2771(MTT)** |
| | ) | |
| **STATE OF GEORGIA, Peach County** | ) | |
| **School District through the Peach** | ) | |
| **County Board of Education,** *et al.,* | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

In this 46-year-old school desegregation case, the United States, the State of
Georgia, and the Peach County School District have moved for the entry of two consent
orders.  In one, the parties ask the Court to find that the Peach County School District
has achieved unitary status with regard to five of the so-called *Green* factors.[1]  (Doc.
42).  That motion is **GRANTED**.  In the other, the parties ask the Court to enter a
mandatory injunction ordering the Peach County School District to take further steps
toward achieving unitary status with regard to the final *Green* factor.  (Doc. 41).  That
motion presents some problems.  Finally, pending before the Court is the March 1988
motion filed by the United States and the Peach County School District (and eight other
school districts) asking the Court to dismiss it from this case because the District has
achieved unitary status.  (Doc. 1-18).

---

[1] *Green v. Cty. Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430 (1968).  As discussed below,
"'unitary status' requires a judicial determination that a school district has implemented a
desegregation plan in good faith and that the vestiges of discrimination have been eliminated to
the extent practicable." *United States v. State of Ga., Troup Cty.*, 171 F.3d 1344, 1349-50 (11th
Cir. 1999).

## I.   BACKGROUND

The United States filed this action in 1969 against the State of Georgia and various school districts and officials seeking the desegregation of public schools throughout the State.  The case has mostly been inactive[2] since January 24, 1974, when the Court entered a Consent Order desegregating the various school districts, including the Peach County School District.  The case surfaced in January 2015 when Byron Peach Charter School, Inc. moved to intervene and asked for authorization to operate a charter school in Peach County.  The charter school had received the necessary state approvals and planned to open for the 2015-16 school year.  The United States initially opposed the charter school on the grounds that the school had not demonstrated it would not "promote the resegregation of high school students" in the Peach County School District.  (Doc. 8 at 7).  The Peach County School District, which had denied the charter school's petition to open,[3] took the position that the United States and the Court "must determine whether authorizing a charter school in the City of Byron provides the greatest benefit for all Peach County children and complies with the Desegregation Order dated January 24, 1974."  (Doc. 7 at 6).

The Court, however, questioned whether it had any business getting involved in a charter school dispute.  More than twenty five years ago, the United States and the Peach County School District jointly moved Judge Owens "to have this case dismissed since these parties agree that defendants have achieved and maintained a unitary

---

[2] Inactive as far as the Court is concerned.  Apparently, being subject to desegregation orders imposes some bureaucratic control and monitoring by the Department of Justice.

[3] Technically, the Peach County Board of Education denied the petition.  Georgia law requires that state charter schools submit concurrently petitions to the local board of education and the State Charter Schools Commission.  The Commission acts on the petition only if the local board of education denies the petition.  O.C.G.A. § 20-2-2084(c)(2).

status in all respects for several years, and that the judgment of this Court has been fully satisfied."[4]  (Doc. 1-18).  That both parties believed the Peach County School District had long ago achieved unitary status troubled the Court because the law is well established that "[r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system."  *Freeman v. Pitts*, 503 U.S. 467, 490 (1992).  In February 2015, the Court ordered the United States and the Peach County School District to update its motion to dismiss and confirm whether the Peach County School District has achieved unitary status.  (Doc. 10).

Both the United States and the Peach County School District responded that Judge Owens denied their joint motion to dismiss in an Order dated January 12, 1989. (Docs. 11; 12).  But as the Court discussed more fully in a prior order, the parties were clearly wrong about what had happened in 1989.  What Judge Owens denied was the Plaintiff-Intervenors' motion to dismiss the case *and* leave the 1974 Consent Order in place—an action the United States argued was both impractical and illegal.  (Doc. 15). After the United States and the school districts represented to the Court that the school districts had achieved unitary status, the Plaintiff-Intervenors objected and began serving discovery requests upon each of the school districts.  *Georgia*, 691 F. Supp. at 1443.  The school districts found the requests "burdensome and possibly aimed at irrelevant matters" and, seeking the path of least resistance, joined in the Plaintiff-Intervenors' motion to dismiss.  *Id.*  It seems that the school districts were reluctant to

---

[4] The United States filed similar motions with other school districts.  *United States v. Georgia*, 691 F. Supp. 1440, 1443 (M.D. Ga. 1988).  At a status conference, the United States explained that it had not received any complaints "as to the operation of these school systems for a number of years, counsel determined it would be appropriate to dismiss them, contacted these school systems, reached agreements and filed the stipulations."  *Id.*

push the Court to determine whether they had achieved unitary status because, in the face of opposition by the Plaintiff-Intervenors, that process would be both expensive and time consuming.  As Judge Owens noted,

> The fact that the extensive discovery and evidentiary hearing required for such a determination [of unitary status] will cause each of these small county school boards to collect taxes from their local property owners to pay necessary attorneys' fees and litigation expenses, seems to be of no concern to the United States, but, of course, is the paramount concern of each of these school boards to whom this is an unnecessary exercise.

*Id.* at 1444.  Nevertheless, Judge Owens determined the issue had to be resolved "at some point" and the United States had "the right to move this court for a finding of unitary status as to each of these school systems."  (Doc. 1-74 at 3).  The United States expressly agreed to shoulder the cost of this inquiry, and Judge Owens ordered the United States to proceed with the inquiry, at its expense.  (Docs. 1-70 at 8-9; 1-74 at 3-4, 9-11).

The Court convened a hearing in March 2015 to hear from the United States regarding whether it had complied with Judge Owens's Order.  (Doc. 15).  At the hearing, counsel for the United States agreed that Judge Owens accepted its proposal to proceed with the inquiry.  (Doc. 21 at 10:4-18).  However, counsel argued that the United States was in compliance with Judge Owens's Order because (1) it made its proposal with the caveat that it had the right to cease to seek unitary status if it determined that any of the school districts were not unitary and (2) "following that [O]rder there have been very specific … concerns."  (Doc. 21 at 10:18-13:7).  When asked what the United States learned in the period following 1989 that led it to no longer believe the truth of its representation to Judge Owens that the Peach County School District had achieved unitary status, counsel informed the Court that "we started to

investigate complaints in 1997 and '98." (Doc. 21 at 20:18-21:18).  Counsel admitted

that she had "no way of filling in the gaps between '89 and what I have on the docket,"

and the best counsel could offer about the "history of this case" was that she spoke with

Franz Marshall,[5] who told her that "there was a proposal made by the United States that

the Court accepted and that that proposal was not pursued by the United States."[6]

(Doc. 21 at 5:7-20).

After the conclusion of the hearing, the Court ordered the United States, the State

of Georgia, and the Peach County School District to complete the factual review

necessary for a determination of unitary status, identify areas in which deficiencies

remain, establish a plan to remedy any such deficiencies, and present to the Court a

joint proposed consent order within six months.

The Court also ordered the United States and the State of Georgia to show

cause why the Court should or should not approve Byron Peach Charter School, Inc.'s

motion for authorization to operate a charter school.  (Doc. 25).  As counsel for Byron

---

[5] Franz Marshall is on the pleadings in this case.  At the hearing, the Court pointed out that Judge Fitzpatrick spoke with Mr. Marshall in 2005 to find out why these cases were still pending some 16 years after Judge Owens's Order.  (Doc. 21 at 7:15-8:10).  After speaking with Mr. Marshall, Judge Fitzpatrick believed that the Department of Justice was pursuing these cases and would submit the information necessary to declare that the districts had achieved unitary status.  Mr. Marshall also represented that some school districts were not being cooperative with regard to providing the necessary information but that the Department of Justice planned on pursuing a show cause order to find out why they were not being cooperative.

[6] The Court has no idea what this means.  As far as the record shows, the United States ignored Judge Owens's Order and promptly put out of mind its promise to Judge Fitzpatrick.  The Court makes no finding in that regard; it is not necessary.  But the Court is concerned by the United States' apparent obliviousness to the real world consequences of what seems to have become permanent control of school districts.  For example, Byron Peach Charter School, Inc. was unable to open for the 2015-16 school year.  No doubt school districts chafe at this oversight, but it seems they are reluctant to mount what they fear would be financially burdensome challenges.  Of course, if federal control is legal, then it should continue.  But as discussed below, no one has even mentioned the legality of continued federal control of the Peach County School District.

Peach Charter School, Inc. noted at the hearing, Byron Peach Charter School, Inc. had "a major concern that I don't think is shared by either of the other parties and that's the urgency of allowing our charter school to open."  (Doc. 21 at 26:18-22).  Byron Peach Charter School, Inc. took the position that it "should be allowed to move forward" and requested "a consent order to be able to get our school opened."  (Doc. 21 at 27:7-10). In May 2015, the Court entered the consent order negotiated by the United States, the State of Georgia, and Byron Peach Charter School, Inc., which imposes obligations on the charter school and the State of Georgia until the Peach County School District achieves unitary status.[7]  (Docs. 28; 30).

    The parties have now moved for an order of partial unitary status and agree that the Peach County School District "has eliminated the vestiges of past *de jure* discrimination, to the extent practicable, in connection with the hiring, assignment and employment of faculty and staff, and its provision of extracurricular activities, facilities, and transportation."  (Doc. 42 at 5).  As to student assignment, however, the United States concluded that the Peach County School District's practices "resulted in a significant number of racially identifiable and/or racially isolated classrooms."  (Doc. 41-1 at 6).  Thus, the parties have moved the Court to enter a consent order that restructures aspects of the Peach County School District's gifted program and

---

[7] Among other things, the consent order requires Byron Peach Charter School, Inc.'s student enrollment to "reflect the racial demographics of high school students enrolled in the Peach County School District," and it requires the State of Georgia to limit Byron Peach Charter School, Inc.'s enrollment of new students if its enrollment "exceeds plus or minus 15% of the eligible black high school student population in Peach County School District for two consecutive years."  (Doc. 30).  Much, and perhaps all, of that order will likely be negated by the United States' discovery that the Peach County School District has largely achieved unitary status, which will mean that the charter school has lost valuable time and expended resources for no good reason.

advanced content and advanced placement courses and continues federal control of the District.  (Doc. 41-1).

## II.     STANDARD OF REVIEW

"Proper resolution of any desegregation case turns on a careful assessment of its facts." *Freeman v. Pitts*, 503 U.S. 467, 474 (1992).  "To be entitled to the end of federal court supervision, a formerly dual school system must be able to prove that it has (1) complied in good faith with the desegregation decree, and (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable."  *NAACP, Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 966 (11th Cir. 2001).  "To determine if a school board has shown a good faith commitment to a desegregation plan, a district court should, among other things, consider whether the school board's policies 'form a consistent pattern of lawful conduct directed to eliminating earlier violations.'"  *Lockett v. Bd. of Educ. of Muscogee Cty. Sch. Dist., Ga.*, 111 F.3d 839, 843 (11th Cir. 1997) (citation omitted).  In evaluating whether the Peach County School District has eliminated the vestiges of *de jure* segregation to the extent practicable, the Court "must examine six facets of school operation: student assignments, faculty assignments, staff assignments, transportation, extra-curricular activities, and facilities … .  In its discretion, a district court may consider other facets."  *State of Ga., Troup Cty.*, 171 F.3d at 1347 (alteration in original) (citation omitted).  These so-called *Green* factors "must be free from racial discrimination before the mandate of *Brown*[8] is met."  *Freeman*, 503 U.S. at 486; *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1337-38 (11th Cir. 2005).

---

[8] *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) (*Brown I*); *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955) (*Brown II*).

III.    ANALYSIS

A.  Joint Motion for Entry of Order of Partial Unitary Status

The Peach County School District provided the United States with information related to each of the *Green* factors, and the United States conducted site visits to the District's schools.[9]  Based on their factual review, the parties have reported that they believe the Peach County School District has achieved unitary status in the areas of faculty and staff assignments, extracurricular activities, facilities, and transportation. (Doc. 42 at 2).

1.  Faculty and Staff Assignments

The 1974 Consent Order requires that staff members who work directly with children and professional staff who work on the administrative level be hired and employed without regard to race, color, or national origin.  *Georgia*, 691 F. Supp. at 1441.  The United States reviewed information provided by the Peach County School District and conducted  interviews of relevant District personnel regarding the hiring and assignment of faculty and staff throughout the District.  The parties submit that the District employs a partially decentralized hiring process.  Teams at individual schools interview and evaluate applicants using a rubric and then recommend selected applicants for hire to the superintendent.  The superintendent then approves or denies those recommendations.  The parties have reported that there is no evidence of discrimination in  the District's hiring, assignment, and employment of faculty and staff. (Doc. 42 at 4).

The parties also submit that in the 2014-15 school year, the racial composition of

---

[9] The parties provided the Court with a status report in June 2015.  At that time, the United States had propounded discovery requests consisting of 172 questions, and the Peach County School District's responses consisted of 3,180 pages.  (Docs. 33; 35).

the District's faculty and staff was 50% white and 48% black, and the racial composition of its administrators was 31% white and 69% black.  The following are the breakdowns for faculty, staff, and administrators for each school in the District:

### Faculty Assignment

| School | Black | White | Other | Total |
|---|---|---|---|---|
| Hunt Elementary School | 19 (45.2%) | 22 (52.4%) | 1 (2.4%) | 42 |
| Byron Elementary School | 11 (33.3%) | 22 (66.7%) | 0 (0.0%) | 33 |
| Kay Road Elementary School | 14 (45.2%) | 16 (51.6%) | 1 (3.2%) | 31 |
| Fort Valley Middle School | 30 (90.9%) | 2 (6.1%) | 1 (3.0%) | 33 |
| Byron Middle School | 9 (31.0%) | 20 (69.0%) | 0 (0.0%) | 29 |
| 9th Grade Trojan Academy | 5 (38.5%) | 8 (61.5%) | 0 (0.0%) | 13 |
| Peach County High School | 12 (28.6%) | 30 (71.4%) | 0 (0.0%) | 42 |
| **District Total** | **102 (44.9%)** | **122 (53.7%)** | **3 (1.3%)** | **227** |

### Staff Assignment

| School | Black | White | Other | Total |
|---|---|---|---|---|
| Hunt Elementary School | 10 (76.9%) | 3 (23.1%) | 0 (0.0%) | 13 |
| Byron Elementary School | 5 (41.7%) | 7 (58.3%) | 0 (0.0%) | 12 |
| Kay Road Elementary School | 12 (75.0%) | 4 (25.0%) | 0 (0.0%) | 16 |
| Fort Valley Middle School | 6 (85.7%) | 1 (14.3%) | 0 (0.0%) | 7 |
| Byron Middle School | 3 (42.9%) | 4 (57.1%) | 0 (0.0%) | 7 |
| 9th Grade Trojan Academy | 1 (33.3%) | 1 (33.3%) | 1 (33.3%) | 3 |
| Peach County High School | 13 (68.4%) | 6 (31.6%) | 0 (0.0%) | 19 |

| | | | | |
|---|---|---|---|---|
| **District Total** | **50 (65%)** | **26 (33.7%)** | **1 (1.3%)** | **77** |

### Administrator Assignment

| School | Black | White | Other | Total |
|---|---|---|---|---|
| Hunt Elementary School | 2 (100.0%) | 0 (0.0%) | 0 (0.0%) | 2 |
| Byron Elementary School | 1 (50.0%) | 1 (50.0%) | 0 (0.0%) | 2 |
| Kay Road Elementary School | 1 (50.0%) | 1 (50.0%) | 0 (0.0%) | 2 |
| Fort Valley Middle School | 2 (100.0%) | 0 (0.0%) | 0 (0.0%) | 2 |
| Byron Middle School | 1 (50.0%) | 1 (50.0%) | 0 (0.0%) | 2 |
| 9th Grade Trojan Academy | 1 (100%) | 0 (0.0%) | 0 (0.0%) | 1 |
| Peach County High School | 1 (50.0%) | 1 (50.0%) | 0 (0.0%) | 2 |
| **District Total** | **9 (69.2%)** | **4 (30.8%)** | **0 (0.0%)** | **13** |

### 2. Extracurricular Activities, Facilities, and Transportation

The parties submit that there is also no evidence of discrimination in the Peach County School District's extracurricular activities, facilities, or transportation. (Docs. 41-1 at 16; 42 at 4-5). The United States reviewed information provided by the District and conducted interviews with relevant District faculty and staff at each of the District's schools regarding sports, after-school programs, and other extracurricular activities. The parties submit that the District provides all of its students the opportunity to participate in extracurricular activities on an equal basis and in a non-discriminatory manner. With regard to facilities, the United States reviewed the relevant information provided by the District and inspected each of its six school facilities. The parties submit

that the District's maintenance and operation of these facilities is carried out in a non-discriminatory manner, and students are provided access to such facilities on an equal basis.

Finally, the 1974 Consent Order requires that bus routes and the assignment of students to buses be designed to insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis.  *Georgia*, 691 F. Supp. at 1442. The United States reviewed transportation data provided by the District and conducted interviews with relevant District faculty and staff about transportation policies in the District.  The parties submit that a majority of students in the District rely on school bus transportation (91.5% of black students and 84.3% of white students) and that the District provides such transportation on a non-discriminatory basis.  The parties also submit that the District provides transportation for students to attend after-school sporting events and other extracurricular activities on an equal and non-discriminatory basis.

Based on all this, the parties submit that the Peach County School District has eliminated the vestiges of past *de jure* discrimination to the extent practicable in connection with the hiring, assignment and employment of faculty and staff, and its provision of extracurricular activities, facilities, and transportation.  The parties thus request that this Court enter an Order stating that these factors are no longer at issue and are considered unitary.

**B. The March 1988 Motion and the Joint Motion for Entry of Consent Order Continuing Federal Supervision**

After conducting its investigation, the United States concluded that the Peach County School District's student assignment practices—including designating students

as "gifted" and otherwise grouping students by ability levels—together resulted in a significant number of racially identifiable and/or racially isolated classrooms throughout the District.  Specifically, the United States concluded that black students were significantly underrepresented in the gifted program and in advanced content courses offered by the Peach County School District in the 2014-15 school year.  The United States came to this conclusion after it "analyzed information and data produced by the District, retained a consultant with expertise in student ability grouping and gifted education, and interviewed school faculty, staff, principals, and other appropriate District administrators."  (Doc. 41-1 at 6).  The Peach County School District "acknowledged this discrepancy and agreed to work with the United States and its expert to address it."  (Doc. 41-1 at 6).

"After cooperative discussion and negotiation," the Peach County School District and the State of Georgia agreed to take certain measures to address the "outstanding concerns of the United States relative to the assignment of students between and within schools in the District."  (Doc. 41-1 at 7).  As outlined in the parties' Consent Order, such measures include:

- The Peach County School District "will develop and implement a process for identifying gifted students that includes the use of valid instruments that are sensitive to cultural bias, and ensures students who are eligible for the District's gifted programs receive services on an equitable basis."

- The State of Georgia will assist the Peach County School District in applying for a waiver of the State-recommended strict cut-off points for gifted designation and funding weights, and counsel for the State of Georgia will recommend that the State Board of Education approve the District's application.

- Before the start of the 2016-17 school year, "the District will revise and implement curriculum offered to gifted students so that it incorporates principles of cultural responsiveness."

- The Peach County School District will "develop specific recruitment and outreach programs directed to black students and families to encourage enrollment in Advanced Content and [Advanced Placement] courses."

(Doc. 41-1 at 7-13). The parties believe that full and good faith compliance with the terms of the Consent Order over a three-year period will enable the Peach County School District to establish the record needed to support a declaration of full unitary status. (Doc. 41-1 at 4).

The parties have moved the Court to find that their proposed consent order "is consistent with the objectives of the Fourteenth Amendment to the United States Constitution and applicable federal law and, if properly implemented, will complete the orderly desegregation of the District and result in the District being declared unitary." (Doc. 41-1 at 4). The Court agrees that the relevant question is whether the consent order is consistent with the Constitution.

Federal judicial supervision of local school systems was intended to be a temporary measure. *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cty., Fla.*, 244 F.3d 927, 941 (11th Cir. 2001); *Freeman*, 503 U.S. at 489. Although "the scope of a district court's equitable powers to remedy past wrongs is broad," "[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Id.*; *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971). "Segregation was the evil struck down by *Brown I* as contrary to the equal protection guarantees of the Constitution." *Swann*, 402 U.S. at 15. Thus, "[t]he vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." *Freeman*, 503 U.S. at 496.

-13-

This last point is key here and bears emphasis.  Simply put, this Court cannot order remediation of racial imbalances unless those imbalances bear a causal link to the *de jure* segregation that existed prior to the Court's desegregation order.  To the Court's surprise, the parties do not address this issue at all.  Neither do the parties provide any details about how the Peach County School District designates students as gifted, assigns ability levels, or otherwise groups students.  All the Court knows is that black students were "significantly underrepresented" in the gifted program and in advanced content courses offered in the 2014-15 school year.

Racial imbalance in schools, without more, does not violate the Constitution. *Milliken v. Bradley*, 433 U.S. 267, 280 n.14 (1977).  The Supreme Court has made clear that "[r]acial balance is not to be achieved for its own sake," but is to be pursued by federal courts only "when racial imbalance has been caused by a constitutional violation." *Freeman*, 503 U.S. at 494.  "Put simply, a school board has no [constitutional] obligation to remedy racial imbalances caused by external factors, such as demographic shifts, which are not the result of segregation and are beyond the board's control." *Manning ex rel. Manning*, 244 F.3d at 941.  More specifically, "[i]t is well-established in [the Eleventh Circuit] that ability grouping is not *per se* unconstitutional, even when it results in racial disparity in a school district's classrooms." *Ga. State Conference of Branch of NAACP v. Georgia*, 775 F.2d 1403, 1412-14 (11th Cir. 1985), *abrogated on other grounds by Lee v. Etowah Cty. Bd. of Educ.*, 963 F.2d 1416, 1419 n.3 (11th Cir. 1992).  Rather, ability grouping is permissible so long as the assignment method "is not based on the present results of past segregation or will remedy such results through better educational opportunities." *Holton*, 425 F.3d at

-14-

1346-47 (quoting *McNeal v. Tate Cty. Sch. Dist.*, 508 F.2d 1017, 1020 (5th Cir. 1975)). "Thus, in a case where the ability grouping practices of a school system are challenged, the court must always consider the history of the school system involved." *Castaneda v. Pickard*, 648 F.2d 989, 996 (5th Cir. June 23, 1981).[10]

Typically, a school district bears "the burden of showing that any current imbalance [in student assignment] is not traceable, in a proximate way, to the prior violation." *NAACP Jacksonville*, 273 F.3d at 966 (quoting *Freeman*, 503 U.S. at 493); *see also Lockett*, 111 F.3d at 843. This is because the Court must presume, in light of the school district's prior operation of *de jure* segregated schools, that "any current racial disparities in [student assignment] are the result of its past unlawful conduct." *NAACP Jacksonville*, 273 F.3d at 966; *Lockett*, 111 F.3d at 843. However, "[a]s the *de jure* violation becomes more remote in time and … demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system." *Freeman*, 503 U.S. at 496.

Here, however, the question of burden of proof has not arisen. The parties agreed in 1988 that the Peach County School District had achieved unitary status in every respect and asked the Court to dismiss the District from the case. For reasons unknown and at a time unclear, the United States changed its mind. Again, it appears that the United States ignored its agreement and Judge Owens's Order to develop the record necessary to confirm, or not, its representation to the Court that the Peach County School District had achieved unitary status. That is troubling, but the Court sees no alternative but to dismiss the March 1988 motion as moot.

---

[10] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

Instead, the Court is left with a request for further judicial supervision.  The parties say the Peach County School District can achieve full unitary status if it and the State of Georgia comply with a consent order which makes seemingly significant changes to the way the District runs its gifted program and advanced content and advanced placement courses.  But the evidence before the Court, with the *possible* exception of some undefined racial imbalance in those programs, suggests that the District has complied in good faith with the desegregation decree and eliminated the vestiges of prior *de jure* desegregation to the extent practicable.  Therefore, granting the parties' request without some evidence, or even a suggestion, that the racial imbalances are the result of some vestige of the prior *de jure* system would be inconsistent with the Supreme Court's directive that federal courts "must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution."  *Milliken*, 433 U.S. at 280-81.

It bears repeating that "[t]he ultimate objective of any desegregation order is the 'restoration of state and local authorities to the control of a school system that is operating in compliance with the Constitution.'"  *Manning ex rel. Manning*, 244 F.3d at 941 (quoting *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995)).  As the Supreme Court has observed, "local autonomy of school districts is a vital national tradition."  *Freeman*, 503 U.S. at 490 (citation omitted).  "Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs."  *Bd. of Ed. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 248 (1991).  School districts that make decisions in the absence of federal supervision "can be held accountable to the citizenry, to the political process, and to the courts in the

-16-

ordinary course." *Freeman*, 503 U.S. at 490.  Before the Court subverts this process by ordering significant changes to the way the Peach County School District assigns students, the Court must be satisfied that the remedy requested by the parties "advances the ultimate objective of alleviating the initial constitutional violation." *Id.* at 489.

The Court recognizes that the Peach County School District may be intimidated by the prospect of the burden it might bear if the United States actively resists its efforts to seek a declaration of unitary status in every respect.  This concern may be warranted.  In *Freeman*, Justice Scalia, in his concurring opinion, warned that the "allocation of the burden of proof foreordains the result in almost all of the 'vestige of past discrimination' cases."  503 U.S. at 503.  This is because, Justice Scalia wrote, the presumption that any current racial imbalance in a school district that engaged in *de jure* segregation is related to that *de jure* segregation is effectively irrebuttable because the school district cannot prove the negative.  *Id.* at 505.  Justice Scalia argued that "[a]t some time, we must acknowledge that it has become absurd to assume, without any further proof, that violations of the Constitution dating from the days when Lyndon Johnson was President, or earlier, continue to have an appreciable effect upon current operation of schools.  We are close to that time." *Id.* at 506.  That was in 1992.

Without in any way prejudging the issue, which the Court cannot since it has so little evidence before it, the Court questions whether that burden would be as difficult to shoulder here.  After all, we are talking about a gifted program and advanced content and advanced placement courses that presumably operate pursuant to some defined criteria some forty years after the end of *de jure* desegregation.  Moreover, enrollment in

advanced content and advanced placement courses typically is a matter of student choice and such courses do not constitute "ability grouping."  *See, e.g., Andrews v. City of Monroe*, 730 F.2d 1050 (5th Cir. 1984); *Castaneda*, 648 F.2d at 997.  In any event, the Court needs to know more.

Therefore, the parties are **ORDERED** to explain no later than December 7, 2015, the factual basis for their request for further judicial supervision over the Peach County School District's student assignments.  If the parties are relying solely on the presumption that the current imbalance is traceable to prior *de jure* segregation, the parties should explain whether such a presumption is enough to allow the Court to enter the Consent Order.  *See NAACP Jacksonville*, 273 F.3d at 975 ("Without proof that the Board's present or former segregative policies or practices are the cause of current racial imbalances, it is under no constitutional duty to employ desegregative techniques not required by the [consent agreement] to combat the demographic factors that are. Furthermore, *we are without power to order it to do so*." (emphasis added)).

**SO ORDERED**, this 10th day of November, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT